**Barry and Karen WILLIAMS, Plaintiffs,**

v.

**Wayne GARRETT, et al., Defendants.**

**Civ. A. No. 88–0003–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 4, 1989.

J. Lloyd Snook, III, Charlottesville, Va., for plaintiffs.

Gregory E. Lucyk, Asst. Atty. Gen., Com. of Va., Major Jeffrey R. Allen, Virginia Dept. of Military Affairs, Staff Judge Advocate, VAAG–JA, Richmond, Va., Sue Keener, Com. of Va., and the Adjutant Gen., Dept. of Military Affairs, Office of Risk Management, Richmond, Va., for defendants.

Mark A. Dombroff, John K. Henderson, Jr., Katten, Muchin, Zavis & Dombroff, Washington, D.C., for Holden, Skeen, McEwen and Vance.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiffs in this case allege that law enforcement officers participating in an aerial and ground search of their property violated their federal constitutional rights as well as their rights under state law. Plaintiffs also allege that the searches, pursuant to a state marijuana eradication program, resulted in tortious injuries under state law. This action is brought under 42 U.S.C. § 1983 and the court has jurisdiction pursuant to 28 U.S.C. § 1343(3) and (4). Defendants have moved for summary judgment under Fed.R.Civ.P. 56 on the basis of qualified immunity. The issues were briefed by both sides and the parties were heard at oral argument on June 27, 1989. The case is now ripe for decision.

As a preliminary matter, this court cannot ignore the magnitude nor the social costs of the drug problem currently facing the United States. However, neither can this court ignore the pressures which the flood of drug cases passing through this nation's courts have exerted on basic constitutional rights. In an effort to combat drug traffic more and more courts have performed a balancing test, either explicitly or implicitly, and have decided that the perceived benefit to the fight against drugs of a restriction on rights outweighs the costs of such a restriction to civil liberties. This is particularly true in the area of qualified immunity. At each turn the restriction undoubtedly seems a small one, perhaps easily overlooked, but this court is mindful of a warning by Thomas Jefferson—a man who was an integral part of both the formation of this nation and of the constitution—"A society that will trade a little liberty for a little order will deserve neither and will lose both."

Nonetheless, this court must apply the law as it can be perceived from the statutory and case law applicable to the facts here.

### I

The plaintiffs in this case are husband and wife; they reside in a rural portion of Fluvanna County, Virginia. The second amended complaint originally named sixteen defendants. However, at the June 27 hearing, plaintiffs' new counsel agreed to dismiss seven of the defendants and proceed against the remaining nine. They are as follows: Wayne Garrett, Deputy Assistant Director, Bureau of Criminal Investigations, Virginia State Police ("VSP"); Colonel James Holden, Chief of Aviation Operations, Virginia Army National Guard ("VANG"); Ray Turner, Special Agent, VSP; Lawrence Davis, Special Agent, VSP; Trooper William H. Reid, VSP; Trooper Latane Harper, VSP; Chief Warrant Officer Leon Skeen, VANG; David McEwen, VANG; and Brian Vance, VANG. All of the defendants are sued solely in their individual capacity.

The second amended complaint contains six counts. Counts I and II allege that the warrantless searches of the plaintiffs' property violated their rights under the Fourth Amendment (Count I) and Va.Code § 19.2–59 (Count II). Counts III, IV and V all arise from the actions of defendant Reid ordering the plaintiffs not to move. Count III alleges that this order constituted an arrest without probable cause and a deprivation of liberty without due process; Count IV alleges that the order was an unreasonable seizure in violation of the Fourth Amendment; and Count V alleges that the order amounted to the torts of false arrest and false imprisonment under state law. Finally, Count VI alleges that the actions of the defendants constituted trespass under state law.

### II

Since the case is before the court on a motion for summary judgment the court must interpret factual disputes in favor of the nonmoving party; the following factual description is therefore based largely upon the facts as alleged by the plaintiffs. Since the case hinges on geographical details and questions of reasonableness, the recitation of facts is somewhat complex.

The Williams' home is located in the mostly rural, southern portion of Fluvanna County, Virginia. The property is part of

an old farm complex; the house and a boxwood hedge adjacent to it are approximately 150 years old. The property is located on a bend in State Route 640 and the house is visible from the road; two driveways connect the house and outbuildings with the highway. The main driveway comes straight off of SR640 before the bend, and the second joins the highway after the bend and connects with a garage adjacent to the house. The house is at the end of the main driveway. On the right as one approaches the house, and parallel to the main driveway, is a boxwood hedge which averages nine feet in height. A stand of trees is located to the left of the main driveway. Thus the trees, the main driveway, and the boxwood hedge are all perpendicular to the front of the house.

Behind the house and slightly to the right is a shed; behind that is the garage serviced by the second driveway. The hedge, the house, the shed and the garage form a rough line. To the right of this line, in 1986, was an open area that was, for the most part, cleared of trees and mowed. About 115 feet from the hedge and house the cleared land ended and forest began. The forested land was also owned by the plaintiffs. In the cleared area stood several trees, a cottage and a "nursery area" containing potted houseplants. The nursery is about fifty feet from the house in the direction of SR640 and the cottage is another twenty feet beyond that. A track leads from behind the garage away from the house and ends in the woods. At the end of the track was an abandoned school bus. In 1986 plaintiffs operated an automobile repair business and an elder care facility on their property.

During 1986 the Commonwealth of Virginia operated a Marijuana Eradication Program ("MEP") under the auspices of the VSP, which also included VANG and local law enforcement personnel. For two weeks during the summer the MEP conducted helicopter surveys of rural parts of the state in the hopes of discovering signs of marijuana cultivation. On the afternoon of July 15, 1986, a helicopter and ground crew were assigned to Fluvanna County. At some point during the afternoon a spotter on the helicopter called out a possible sighting of marijuana.

The helicopter descended and circled the location and Jackie Gillespie, a local deputy who is not a party to this suit, confirmed the sighting of what he claimed looked like marijuana. This conclusion was based on three factors: "the distinctive, bright green color of the plants ... the fact that it appeared the grower was trying to hide the plants behind the shed,[1] and because the plants were located outside the curtilage."[2] The helicopter passed low enough on its search for the downdraft from the rotors to pull portions of the tin roof off of the cottage. At some point after making the observation, the helicopter moved to a location over the woods near the abandoned school bus. Plaintiffs estimated the trees in this area to be fifty to sixty feet tall and therefore the helicopter's altitude to be seventy-five feet or close enough for the downdraft to damage tree branches.

On the basis of Gillespie's observation, the ground crew, waiting at a nearby staging area, was called in. No warrant was obtained before the search commenced. Approximately sixteen people proceeded to the Williams' property; however, not all of them entered onto the property. Some were disoriented and never arrived, and others remained out on the highway without entering the property. The first car up the main driveway contained defendants Reid and Harper. Both men got out of the vehicle; Harper, following instructions radioed from the helicopter, made his way through the boxwood hedge; Reid, armed with an automatic weapon, remained near the car. When approached by the plaintiffs some minutes after his arrival, Reid told them "stay right where you are—don't move." Harper, meanwhile, continued his

---

1. While it is not entirely clear, what Gillespie referred to as the "shed" is apparently what plaintiffs call the "cottage."

2. As it turned out, since no marijuana was found the color cannot be that "distinctive," there is no evidence that the plants were indeed being hidden, and whether the plants were inside the curtilage is a hotly contested issue.

search beyond the boxwood hedge. After searching for several minutes he was unable to find any contraband and returned to his car where he observed Reid and the Williams. Uncontradicted testimony shows that the only plants on the property were roses, white pine seedlings and other houseplants.

The only other persons who actually entered upon the property were Davis and Turner. Davis pulled in at the foot of the main driveway and parked. As he got out he saw Harper coming out of the hedge and heard him say that there was no marijuana. Turner, who had parked on SR640, also came up the main driveway as Harper exited the hedge. According to Davis, Turner and he spoke for a moment on the driveway. In his affidavit Turner does not mention Davis at all and indicates that he spoke only with Harper. In any event, Turner did no more than walk on the driveway. After Harper determined that the sighting was erroneous, all those officers present returned to their vehicles and left the premises.

For ease of analysis the nine defendants in this case can be divided into four groups; each group will be discussed separately as different legal and factual elements determine the outcome. The first group consists of defendants Turner and Davis. Defendants Garrett and Holden, the two administrative officials, constitute the second group. The crew of the helicopter, defendants Skeen, McEwen and Vance, along with Harper, the trooper who actually searched the premises, make up the third group. Reid, the erstwhile "tact (sic) man,"[3] comprises the fourth category.

### III

Summary judgment is proper only when it is clear that there is no genuine dispute concerning either the facts material to the controversy or the reasonable inferences to be drawn from those facts. *Pulliam Investment Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). The party seeking summary judgment carries the burden of showing that there is no genuine issue as to any material fact in the case. *Id.* This court must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party. *Id.* All reasonable inferences of fact, as well, must also be interpreted against the moving party and in favor of the opposing party. *Butler v. Cooper,* 554 F.2d 645, 647 (4th Cir.1977). Unless the requisite conditions are met, summary judgment is inappropriate.

### A. *Group I*

■ The answers to interrogatories provided by defendants Turner and Davis indicate that they did no more than park on or near the driveway and then enter it on foot. There is no contradictory evidence indicating that while outside their cars Turner or Davis strayed beyond the limits of the driveway or engaged in any search activity. In order for the actions of Turner and Davis to give rise to a Fourth Amendment violation the plaintiffs must have had a reasonable expectation of privacy in their driveway. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). It is essentially settled, as a matter of federal law, that a landowner does not have a reasonable expectation of privacy in a rural driveway. *See United States v. Smith,* 783 F.2d 648, 651 (6th Cir.1986); *United States v. Ventling,* 678 F.2d 63, 66 (8th Cir.1982). This is particularly true in cases such as the present one where the owner has not blocked the driveway or posted "no trespassing" signs.

Since there is no indication that Turner and Davis did anything other than enter upon the driveway, and since plaintiffs could have no reasonable expectation of privacy in their driveway, the actions of defendants Davis and Turner did not violate the Fourth Amendment. Summary judgment in their favor is, therefore, appropriate. Since the federal claims against these defendants will be dismissed, the court will not address the question of

---

**3.** See Defendants' Memorandum in Support of the Motion for Summary Judgment, at 8.

"Tact" is apparently short for tactical, a reference to the officer's security duties.

whether their actions give rise to any liability under state law.

## B. *Group II*

■ Defendants Garrett and Holden were administrative officers whose only connection to the search in this case is that they formulated the administrative guidelines under which the MEP operated. While supervisory liability in the civil rights context can extend to the highest levels of state government, the plaintiff in such a case bears a heavy burden of proof. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir.1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Liability in such cases does not arise from the principle of *respondeat superior*, but from a recognition that "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict...." *Id.* at 372.

■ As a result, the plaintiff in such a case may not rely on evidence of a single incident or isolated incidents to impose supervisory liability. *Id.* at 373. Instead, he must demonstrate a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* Even without addressing the underlying question of whether a constitutional violation has occurred in this case, it is clear that the plaintiffs have failed to introduce the requisite evidence to support their claim of supervisory liability.[4] No evidence outside of the events of the single search of the plaintiffs' property has been proffered. Therefore, as to defendants Garrett and Holden, summary judgment is appropriate.

## C. *Group III*

■ The remainder of the defendants raise the shield of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The defendants in this case, state law enforcement officers, are entitled to qualified immunity if the underlying facts support the claim of such immunity. *See Anderson v. Creighton*, 483 U.S. 635, 642 n. 4, 107 S.Ct. 3034, 3040 n. 4, 97 L.Ed.2d 523 (1987); *Clark v. Link*, 855 F.2d 156, 160 (4th Cir.1988). Under the *Harlow* standard, the officers are protected if their conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person should have been aware." *Giancola v. West Virginia Dept. of Pub. Safety*, 830 F.2d 547, 550 (4th Cir. 1987). Even where the search in fact violates the Fourth Amendment, an officer is still entitled to qualified immunity if a reasonable officer could have believed that the search was constitutional. *See Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039; *Giancola*, 830 F.2d at 550.

*Anderson* makes clear that this court is to dismiss actions against officers as soon as it is apparent that their actions were such that a reasonable officer could have believed them lawful. *Anderson*, 483 U.S. at 646, n. 6, 107 S.Ct. at 3042, n. 6. This court must also define the challenged conduct with sufficient particularity so that actions which in actuality are protected do not, by force of semantics, lose their protection. *Id.* at 639–640, 107 S.Ct. at 3038–39. Thus, the task for this court, in deciding a motion for summary judgment on qualified immunity grounds, is that of deciding whether, interpreting the facts and inferences in favor of the nonmoving party, a reasonable officer could have believed that the warrantless search of the plaintiffs' property in this case did not violate clearly established constitutional or statutory rights.

A warrantless search is presumptively unreasonable. *Katz*, 389 U.S. at 357, 88 S.Ct. at 514. There are only a few, narrowly limited exceptions to this rule. *Id.* Defendants in this case argue that the area searched was outside the curtilage of the Williams' home, and therefore falls under the "open fields" exception to the warrant requirement. *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed.

---

**4.** To the extent that plaintiffs argue that the guidelines themselves were unconstitutional, and the Group II defendants liable on that basis, the court's analysis in § III(C) of this opinion applies.

898 (1924). Further refining the question to fit this particular case, this court must determine whether a reasonable officer could have believed that the area searched was outside the curtilage of the home.[5]

█ The curtilage can be conceived of as that area inside a line which divides the private confines of the home from the surrounding open fields. What constitutes the curtilage is a question of fact. *United States v. Berrong,* 712 F.2d 1370, 1374 (11th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). Four factors guide this court's determination of that factual question: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987).[6] However, these factors are not a rigid, "bright line" rule. Rather, they are tools to be used in answering "the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* Both parties submitted photographs of the Williams property and the plaintiffs sub-mitted a scale drawing to aid the court's decision.[7]

█ From the line formed by the boxwood hedge, the house, the shed and the garage to the woods is a distance of approximately 115 feet. The length of this area, from the garage to the highway was approximately 200 feet. At the time of the search this area was kept mowed by the defendants and was considered by them to be part of their yard. Within this mowed area were several large trees, a garden or nursery area and a cottage. The area searched, though not nailed down beyond a doubt, was between the cottage and the nursery area—approximately 60 to 100 feet from the house, and obviously much closer to the cottage.[8] It appears to this court that there is a genuine dispute over whether this area could reasonably be thought to have been outside the curtilage—a question of fact which is material, if not dispositive.

The barn searched in *Dunn* was 180 feet from the defendant's ranch house, and was outside a fence which enclosed the house. The area at issue here was almost three times closer than the area in *Dunn.* The area searched was also no more than 20 feet from the cottage. Looking to the second factor, while no fence surrounded the Williams home, reading the word "enclosure" in *Dunn* to require an artificial barrier seems unduly narrow. The boxwood

---

**5.** It was clearly established in 1986 that warrantless ground searches of the curtilage of a home, absent probable cause and exigent circumstances, violated the Fourth Amendment. *See Katz,* 389 U.S. at 357, 88 S.Ct. at 50; *United States v. Baldwin,* 691 F.2d 718, 721 (5th Cir. 1982); *United States v. Jackson,* 585 F.2d 653, 660 (4th Cir.1978). As to the aerial search, see note 9, *infra.*

**6.** This court must determine what was clearly established in 1986. While *Dunn* was decided in 1987, it clearly was more restrictive than prior law, *Dunn,* 480 U.S. at 308, 107 S.Ct. at 1143 (Brennan, J., dissenting) and guides the court only in determining a minimum of acceptable behavior.

**7.** The utility of these photographs is limited by the fact that they depict the property as it appears now and not at the time of the search. Substantial modifications to the disputed area have been made, not the least of which is the addition of a swimming pool, which make it all but impossible to determine how the land appeared in 1986.

**8.** The area actually searched, obviously a fact of some importance, is not clearly settled. The materials submitted by the defendants are inconsistent themselves. At one point the defendants argue that the area searched was adjacent to the garage (Reply Memorandum in Support of Summary Judgment, at 4), while at another point they say that Harper searched the area beyond the hedge (Memorandum in Support of Summary Judgment, at 8)—an area approximately 150 feet from the garage. Since the helicopter reported seeing the alleged marijuana apparently "hidden" behind the cottage, and other evidence indicates that the only growing plants in the area were near the nursery, and since that is the area closest to Harper's entry onto the property, the court will assume, for the purposes of summary judgment, that the area searched was between the cottage and the nursery.

hedge and the heavy woods created a natural enclosure around the home and yard; requiring a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches is not required by the constitution. The area searched could be found to be within the confines of an enclosure protecting the curtilage.

The area searched, again, could be found to be a part of the Williams' yard, for lack of a better word. The record does not reveal that there was any objective evidence available to the officers at the time of this search that the yard was used for anything else other than the "intimate activities of the home." The garage where the auto repair business operated was accessible from a separate driveway, and was over 140 feet from the area searched. There was no evidence that patrons of the auto repair business were allowed to roam at will through the yard. While the plaintiffs operated an elder care facility on the premises, the evidence before the court is insufficient to determine the nature or extent of this activity, the location in which it was carried out, and whether restrictions were imposed on the movements of patrons or guests. Finally, the boxwood hedge, though not planted by the plaintiffs, was maintained by them and, as evidenced by Harper's having to go through it to search the yard, effectively blocked viewing of the yard by casual passersby.

The court finds that equally strong arguments can be made placing the area searched outside of the curtilage. Perhaps the strongest is the fact that the plaintiffs carried on several businesses on the premises. While the extent of these businesses is not known, their existence could have lead the officers to believe that the entire property was open to business customers and therefore not part of the curtilage.

Secondly, the number and location of trees on the premises may have lead officers to believe that the area searched was sufficiently separated from the house. Finally, the distances involved, coupled with irregular maintenance and the rural location, may have created an impression that the search area was not part of the yard but an open field.

The arguments put forward here are not exhaustive, but are only intended to illuminate the breadth of the dispute existing over the curtilage issue. Whether the area searched was curtilage is dispositive as to all defendants in Group III.[9]

At this point, the court is faced with a recurring and frustrating dilemma. As any first year law student knows, when material facts or inferences are in dispute summary judgment must be denied. Viewing the case under Rule 56, the decision is easy, and the court is confident that, in the average case, defendants' motion summarily would have been denied. However, the Hydra-like head of qualified immunity having been raised, the decision is far more complex; each time the plaintiffs or the court lop off one head, another appears to block the way.

If a party is entitled to qualified immunity then summary judgment must be granted in his favor. *Anderson*, 483 U.S. at 646, n. 6, 107 S.Ct. at 3042 n. 6. In order to be entitled to qualified immunity the party's conduct must not have violated clearly established constitutional norms. *Id.* at 641, 107 S.Ct. at 3039. If the acceptability of an officer's conduct is debatable, it must, *a priori*, not have violated *clearly established* norms. The result, in essence, is that for a court to deny a finding of qualified immunity it must have facts sufficiently strong to grant summary judgment for the nonmoving plaintiff—it must "neces-

---

**9.** Even were the area searched clearly within the curtilage, the plaintiffs would face further hurdles before making a case against the helicopter crew. The Supreme Court has upheld the constitutionality of warrantless, physically nonintrusive observation of the curtilage of a residence from an aircraft lawfully operating within publicly navigable airspace. *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90

L.Ed.2d 210 (1986); *Giancola*, 830 F.2d at 550. As a result, to state a Fourth Amendment claim the plaintiffs must show that the particular search was unreasonable in the manner in which it was carried out. *See Id.* In light of the court's decision on the immunity question, it expresses no opinion as to the reasonableness of the helicopter search.

sarily" find that constitutional mandates were broken. *Tarantino v. Baker*, 825 F.2d 772, 775 (4th Cir.1987); *Osabutey v. Welch*, 857 F.2d 220, 223 (4th Cir.1988) (to deny immunity court must be able to conclude that the conduct contravened clearly established constitutional principles). In simpler cases this is not a problem; however, particularly in the civil rights area, few cases are clear cut. In this action, the factual/inferential question of whether the searched area was curtilage is highly disputed. It is a question which this court routinely would leave to a jury, because under Rule 56 triers of the facts are charged with making that determination. However, under *Harlow* and its offspring, particularly *Anderson* and the cited Fourth Circuit cases, such a dispute apparently mandates a finding of qualified immunity.

In this court's view the facts are strong enough to make a legitimate argument that the area searched was clearly curtilage (and the search therefore clearly outside settled constitutional bounds), but not strong enough to grant summary judgment on the question. However, neither are the facts strong enough to give summary judgment to the defendants on the curtilage question. In ordinary cases, the issue of curtilage *vel non* should go to the jury under Rule 56. But as this court reads *Anderson, Tarantino* and *Osabutey*, if the issue is for the jury then whether the officers have acted in violation of "clearly established constitutional norms" has been answered in favor of the officers, and immunity attaches, so that summary judgment must enter in favor of these defendants. The result is this: in cases where qualified immunity is raised as a defense, disputed facts and certain inferences (in this case as they relate to the curtilage issue) must, in effect, be resolved in favor of the *moving* party, and summary judgment on the basis of qualified immunity granted.[10] The mutations worked by the decisional application of the qualified immunity doctrine in this case have turned, at least from the court's perspective, the precepts of Rule 56 on their head.

While this result comes about by applying the instructions of precedent, the court notes with emphasis that the result here is very closely fact-bound, and it is doubtful that any generally applicable rule of law can be determined from this fact-bound analysis.

Initially, *Harlow* applied the doctrine of qualified immunity to high level, policy making officials; the number of cases in which it arose were limited. It may be that only as the the scope of the immunity has broadened to include almost every public employee has the potential clash with Rule 56 become noticeable. In any event, while the problem may be clearest at the district court level, the resolution of this problem is bound by the precedents of the Supreme Court and the Fourth Circuit. Precedent within this circuit, as well as from the Supreme Court, if it is to be modified, must be modified by those authorities. At this juncture the court can do no more than note the dilemma and fashion relief in a manner it believes is consistent with the extant decisional law.[11] As a result, though the court finds that material facts or inferences are clearly in dispute, it must, because of the precedential analysis of qualified immunity, award summary judg-

---

10. While language in *Turner v. Dammon*, 848 F.2d 440 (4th Cir.1988), at first glance seems to indicate that factual disputes may prevent summary judgment on the immunity question, it does not appear to apply to this case. In *Turner*, the court stated that if the record showed that an "issue of triable fact exists as to whether defendants' conduct violated plaintiffs' clearly established rights" then summary judgment should be denied. *Turner*, 848 F.2d at 443. The language preceding this quotation makes it clear, though, that the court was dealing with a situation where the conduct clearly violated constitutional norms and the question was merely one of whether a particular defendant had engaged in that conduct.

11. Perhaps a solution would be to split the qualified immunity issue from the rest of the case and try it separately, to a jury. This would preserve the the *Harlow* goal of preventing defendants from having to bear the burden of trials on the merits when the underlying claims are insubstantial. Yet it would also preserve the plaintiff's right to a jury's determination of close questions of fact bearing on the reasonableness of an officer's actions.

ment to the defendants in Group III on the basis of that qualified immunity.

## D. *Group IV*

While defendant Reid also raises the defense of qualified immunity, the underlying factual issues are different from those involving the Group III defendants. The question is not whether the search was lawful, but whether a seizure of the plaintiffs' persons has occurred and whether such a seizure was lawful. Reid was the "tact man" assigned to provide security to the ground crew. He was stationed by his vehicle armed with an M–16 rifle.[12] When approached by the plaintiffs he told them "don't move—stay right where you are." Little detail exists in the record as to what transpired subsequently. Plaintiffs assert that they were questioned by Reid; Reid that he was questioned by the plaintiffs. In any event, the interaction did not last more than a few minutes and ended with Harper's emergence from the hedge.

Defendants characterize the encounter as a "consensual" one, but the court has no difficulty finding that a seizure did occur. The question is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion). While the Fourth Circuit has declined specifically to adopt this test, *United States v. Gooding*, 695 F.2d 78, 81 (4th Cir.1982), it has frequently reviewed district court decisions based on that standard. *See, e.g., United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986); *United States v. Aguiar*, 825 F.2d 39, 40 (4th Cir.), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987). "An individual need not be held at gunpoint" for a Fourth Amendment seizure to occur. *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

"Any restraint of movement will do," *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir.1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980), including "a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way." *Black*, 675 F.2d at 135. The visible presentation of the weapon, along with an order not to move, clearly indicate that the Williams would not have felt "free to leave." While a seizure occured, not all seizures are unreasonable.

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) a limited seizure of a person may be carried out if the officer has a reasonable suspicion that the person is engaged in criminal conduct. *See United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Under *Terry*, an officer may detain an individual and question him for limited purposes. Blocking a person's progress and showing weapons does not turn a *Terry*-type seizure into an arrest. *See id.* at 377. And while *Terry* stops may not continue indefinitely, the length of this stop (no more than fifteen minutes) did not take it outside the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (Twenty minute investigative stop does not violate Fourth Amendment). Plaintiffs have not submitted sufficient evidence of what transpired during the fifteen minute period to survive a summary judgment motion based on *Terry*.

The court notes that this decision is predicated on the previous decision on the search itself. If the officers were, in fact, impermissibly engaged in the search, then it would seem that a *Terry* stop arising from that search would also be impermissible. However, since qualified immunity protects the Group III defendants, it must also protect Reid. Summary judgment

---

**12.** Defendants admit that Reid was authorized to carry such a weapon, but seem unwilling to admit or deny that he was so armed at the time. Again, for the purposes of summary judgment, the court will accept the plaintiffs' allegation that he was carrying an M–16 as true. In light of his authorization, and the fact that he was to provide security, this does not seem unreasonable.

must, therefore also be granted in his favor.

### IV

In conclusion, the court must reiterate its concern with the way in which the decision in this case arises; the tension between *Harlow* and Rule 56 must be acknowledged and addressed at some point. At this time, though, the court is compelled to grant summary judgment in favor of all the defendants. In light of the decision on the federal questions the court will dismiss without prejudice the plaintiffs' state law claims. *See United Mine Workers of America, v. Gibbs,* 383 U.S. 715, 726–727, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966); *Reamer v. United States,* 459 F.2d 709, 711 (4th Cir.1972).

An appropriate Order shall this day issue.