**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3078
_____

UNITED STATES OF AMERICA

v.

RONELL MOSES, JR., a/k/a Ronell Moses,
            Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:21-cr-00160-001)
District Judge: Hon. William S. Stickman, IV
_____

Argued: March 26, 2025

Before: BIBAS, PHIPPS, and AMBRO, *Circuit Judges*

(Filed: July 3, 2025)

Stacie M. Fahsel
Elisa A. Long
Renee Pietropaolo
Jasmine R. Sola          **[ARGUED]**
FEDERAL PUBLIC DEFENDER'S OFFICE
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
    *Counsel for Appellant*

Laura S. Irwin
Matthew S. McHale          **[ARGUED]**
UNITED STATES ATTORNEY'S OFFICE
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

The Fourth Amendment does not protect every place that a suspect might go. It guards only "persons, houses, papers, and effects." Though someone's land is not his house or effects, some of it is so close to his house that we protect it as the house's "curtilage." Ronell Moses contends that a police officer stepped onto his curtilage without a warrant when the officer pulled him over, walked up his driveway to question him, searched his car, and found a gun that Moses was forbidden to

2

have. But his driveway was not curtilage, so we reject Moses's Fourth Amendment challenge.

Moses also argues that it violates the Second Amendment to prosecute him for possessing a gun. Yet our precedent holds that because Moses was a felon on probation, he may be disarmed. We will thus affirm his conviction.

## I. POLICE WALK UP MOSES'S DRIVEWAY, SEARCH HIS CAR, AND FIND A GUN

One morning, Ronell Moses was driving through his Pittsburgh suburb. Driving in the other direction was Officer Dustin Hess, in a marked police SUV with his windows rolled down. As they passed each other, the officer smelled burnt marijuana, suggesting that Moses was smoking while driving, and saw that the car's windows were tinted very dark—both of which are illegal. 75 Pa. Cons. Stat. §§ 3802(d)(1), 4524(e)(1). So the officer made a U-turn and followed Moses, smelling burnt marijuana wafting from the car the whole time.

Eventually, Moses reached his home and pulled into the driveway. The officer parked at the driveway's entrance and walked up the driveway to Moses's car. He searched the car and found a loaded, stolen pistol in the center armrest. That was a problem for Moses. He had prior felony convictions for voluntary manslaughter and kidnapping, so federal law barred him from possessing a gun.

Moses was arrested and charged with possessing a gun and ammunition as a felon. 18 U.S.C. § 922(g)(1). He moved to dismiss the indictment, challenging this law as unconstitutional under the Second Amendment, but the District Court denied

3

his motion. Next, he moved to suppress the gun, claiming that the officer had invaded his home's curtilage without a warrant by walking up his driveway; the District Court rejected that motion too. Then Moses pleaded guilty conditionally, preserving his right to appeal that (1) his car was parked in his home's curtilage and so the officer needed a warrant to walk up to it, and (2) § 922(g)(1) is unconstitutional on its face and as applied to him. Now he brings this appeal.

## II. UNDER *ORNELAS*, WE NOW REVIEW CURTILAGE DECISIONS DE NOVO

The Fourth Amendment expressly protects houses. Yet as courts have long recognized, a house's boundaries stretch beyond its four walls to "the land immediately surrounding and associated with the home," meaning "the area to which extends the intimate activity associated with 'the sanctity of a man's home and the privacies of life.'" *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). Think of someone's porch, or his garden under the kitchen window. *Collins v. Virginia*, 584 U.S. 586, 593 (2018). This area, falling outside the home proper but still protected as part of it from government snooping, is the curtilage. Police cannot enter it without probable cause and either a warrant or an exception to the warrant requirement. *Id.* at 593, 601.

Moses does not dispute that the officer had probable cause. But he insists that when the officer walked up the driveway to his car, the officer stepped into his home's curtilage without a warrant or applicable exception.

Before reaching the merits of that argument, we must resolve what standard of review to apply to curtilage decisions. When

4

reviewing suppression rulings, we typically review legal rulings de novo and factual findings for clear error. *United States v. Kramer*, 75 F.4th 339, 342 (3d Cir. 2023). Which of those is a decision about the extent of curtilage? More than three decades ago, we held that whether an area lies within the curtilage is a factual finding that we review for clear error. *United States v. Benish*, 5 F.3d 20, 23–24 (3d Cir. 1993). But Moses contends that a more recent Supreme Court decision abrogates our precedent, requiring de novo review. *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996).

The government claims that Moses forfeited the standard of review by not arguing it below—and even conceded that curtilage is a factual question. Yet "a party cannot waive, concede, or abandon the applicable standard of review." *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203 n.2 (3d Cir. 2023) (cleaned up). Plus, the standard of review is not an issue for trial courts; it arises only on appeal. So Moses could not have abandoned this issue by failing to argue it below. We thus can (and must) reach it. And we agree with Moses: Our decision in *Benish* has been abrogated by *Ornelas*.

In *Ornelas*, the Supreme Court held that when officers stop a person or search a place, courts should review de novo whether the officers had probable cause. 517 U.S. at 696–97. It gave three reasons for choosing this standard. First, Fourth Amendment rights should be uniform: Only de novo review can prevent the Fourth Amendment's scope from depending on district court judges' varying views of whether similar facts establish probable cause. *Id.* at 697. Second, probable cause is a vague standard that requires clear precedent to fill in. *Id.* Third, de novo review helps develop clear rules, guiding police on

whether they can seize a suspect or search his property. *Id.* at 697–98.

Though the standards of review for probable cause and for curtilage are different issues, the Supreme Court need not answer the exact same question as our precedent to abrogate it. It is enough if the Supreme Court decides a similar issue using reasoning that, if applied to the issue in our prior holding, would compel a different answer. *Hassen v. Gov't of V.I.*, 861 F.3d 108, 112–13 (3d Cir. 2017); *United States v. Henderson*, 64 F.4th 111, 118–19 (3d Cir. 2023).

*Ornelas* did just that. It announced that a mixed question of fact and law gets reviewed de novo if (1) it decides the extent of Fourth Amendment rights, (2) it is a nebulous standard that needs precedent to clarify, and (3) officers need clear guidance. *Ornelas*, 517 U.S. at 697–98. All three features are present in curtilage decisions.

That said, whether an area is curtilage is a bottom-line legal conclusion that depends on factual findings. So courts considering curtilage challenges proceed in two steps. First, they find facts about the relevant part of the defendant's property—say, that the officer got within twenty feet of the defendant's front window. Those factual findings should still be reviewed for clear error. Second, courts give those facts legal meaning: curtilage or not. This legal evaluation should be reviewed de novo.

In making that ultimate decision, the district court may consider the four factors from *United States v. Dunn*, 480 U.S. 294, 301 (1987). If it does, it must find facts for each factor (say, that the garden was two feet from the house), then gauge their legal significance (say, whether that distance was so close that

6

it favors the garden's being curtilage). The court must then balance all four factors to reach a decision. The court makes legal holdings both when it decides who wins each factor and when it balances the factors overall. We must review both types of holdings de novo.

By reviewing curtilage decisions de novo, we align with every other circuit that has staked out a clear position post-*Ornelas*. *United States v. Diehl*, 276 F.3d 32, 37–38 (1st Cir. 2002); *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018); *United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002); *United States v. Johnson*, 256 F.3d 895, 912–14 (9th Cir. 2001) (en banc) (per curiam); *United States v. Cousins*, 455 F.3d 1116, 1121 & n.4 (10th Cir. 2006) (en banc in relevant part); *see also State v. Martwick*, 604 N.W.2d 552, 557–58 (Wis. 2000) (reviewing *Dunn* factors for clear error but ultimate curtilage decision de novo).

A few circuits have yet to decisively weigh in. The Sixth Circuit has not decided a standard for curtilage decisions on motions to suppress, while Eighth Circuit panels have split. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (deciding standard when reviewing civil summary judgment); *United States v. McGhee*, 129 F.4th 1095, 1101 n.3 (8th Cir. 2025). The Seventh Circuit's approach is unsettled: One panel announced a clear-error standard, yet later opinions seemed to consider the question open. *United States v. Shanks*, 97 F.3d 977, 979 (7th Cir. 1996) (holding that curtilage is reviewed for clear error and citing, curiously, *Ornelas*); *United States v. Redmon*, 138 F.3d 1109, 1132 (7th Cir. 1998) (en banc) (Posner, C.J., dissenting) (stating that curtilage is reviewed de novo); *Bleavins v. Bartels*, 326 F.3d 887, 891 n.3

7

(7th Cir. 2003) (suggesting that the question is open). And the most recent Seventh Circuit decision did not defer to the District Court's curtilage decision but instead conducted full de novo review. *Compare United States v. Sweeney*, No. 14-CR-20, D.I. 28 at 7–8 (E.D. Wis. July 24, 2014) (district court holding that area was not curtilage), *with United States v. Sweeney*, 901–02 (7th Cir. 2016) (plenary review without deference).

So no circuit has definitively held that curtilage is reviewed for clear error after *Ornelas*, and we perceive no circuit split. We join our sister circuits in holding that de novo review applies.

### III. BY WALKING HALFWAY UP THE DRIVEWAY, THE OFFICER DID NOT INVADE THE CURTILAGE

When the officer walked alongside Moses's car, he did not step into the house's curtilage. Three lines of reasoning each point to that conclusion. First, a holistic view shows that this patch of driveway was not an extension of Moses's home. Second, the *Dunn* factors confirm that belief. And third, reasoning from the purpose of the curtilage rule confirms it too: A reasonable officer would not expect to learn more about the inside of Moses's home by walking up the driveway than he could by standing on the street.

#### A. The patch of driveway is not an extension of Moses's home

The District Court applied the *Dunn* factors and concluded that the middle of Moses's driveway was not within his home's curtilage. Yet the test for whether an area is curtilage is not the *Dunn* factors themselves, but instead "whether the area in

8

question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. The *Dunn* factors are heuristics for this question, "useful analytical tools only to the degree that, in any given case, they bear upon" it. *Id.* Indeed, in its two most recent curtilage cases, the Court skipped the *Dunn* factors and simply applied its "daily experience" to decide that an area counts as curtilage. *Florida v. Jardines*, 569 U.S. 1, 5–7 (2013); *Collins*, 584 U.S. at 593–94. We will do the same.

As we do, keep in mind the following screenshots from the officer's bodycam footage. The first shows where Moses parked, filmed as the officer stood on the edge of the driveway. The officer walked up to the car and questioned Moses while standing at its passenger- and driver's-side doors.



The next photo shows, from the officer's perspective, how far onto Moses's property he advanced. The part of the driveway where the officer was standing did not butt up against Moses's house, as a front porch or side garden does. On the contrary, Moses's car was parked about twenty feet into a

9

seventy-foot driveway, so the officer was still several dozen feet from the garage. The driveway was not secluded, but plainly visible from the street and on the path that any stranger might take to the front door. In short, Moses did not have a reasonable expectation of privacy in that part of his driveway like the one he has in his home.



Contrasting this case with the driveway section that the Supreme Court treated as curtilage in *Collins*, shown in the photo below, only buttresses our conclusion. There, the officer walked all the way up the driveway and into the nook pictured below, which abutted the house. He then strode up to the motorcycle and yanked off its tarp. 584 U.S. at 589. He thus walked past the house's front wall, got within arm's reach of its side, and poked around a semi-enclosed inlet just outside a side door (the house's outer wall is visible at the right of the photo). *Id.* at 593. By contrast, the officer here stayed thirty to forty feet in front of Moses's home, in the bottom half of an exposed

driveway connected to the public street. App. 19, 277–78. That is not part of Moses's home.



Cert. Petition, App. 114, *Collins*, 584 U.S. 586 (No. 16-1027)

**B. The *Dunn* factors confirm our view**

Although the *Dunn* factors are not very illuminating here, they reinforce our holding. They ask:

(1) how close the area was to the house;

(2) whether it was enclosed with the house;

(3) whether the homeowner apparently used it for domestic activities; and

(4) how much Moses shielded it from the view of people passing by.

*Dunn*, 480 U.S. at 301.

11

Start with proximity. The government did not contest this factor below, so the District Court treated that silence as a concession that this factor favors Moses. But the officer did not get close to Moses's house. The District Court found that Moses had parked "twenty to thirty feet into the driveway," which was seventy feet long. App. 19. This finding was not clear error: The officer's bodycam footage shows that Moses's car was parked just past the start of a retaining wall, which the dissent acknowledges started twenty-five feet into the driveway. The same footage shows that the officer walked about halfway up the length of the car, so he was likely slightly closer to the street than to Moses's house and certainly thirty to forty feet away from the house. So even if the government's concession forces this factor to favor Moses, it does not favor him much.

The dissent adds two points that we agree with but draw different lessons from. It first points out that "a portion of property need not physically abut the house to fall within the home's curtilage." Dissent at 13. We agree. The line where someone's plot of land becomes his home depends on context. And in this suburban context, standing a few paces from the public street and no closer to the house than to the road, the officer had not entered the seclusion of Moses's home. The dissent also points out that the officer was near the stairs to Moses's porch, and porches are curtilage. But this factor asks how close the officer got to the house, not how close he was to some other place near the house. Getting *close* to curtilage does not mean stepping *onto* it.

Next, consider whether the area was enclosed with the home. This factor asks whether an enclosure suggests that the driveway is "part and parcel of the house," rather than in an

12

area "separate from the residence." *Dunn*, 480 U.S. at 302. Here, there was no fence, wall, or other enclosure clearly separating the part of the driveway where the officer stood from the property's open fields. Moses points to a tall hedgerow on the right edge of his property. But that argument misunderstands this factor, which focuses on enclosures *within* the property separating its domestic area from its open fields, not enclosures marking the property line. *See United States v. Traynor*, 990 F.2d 1153, 1158 (9th Cir. 1993), *overruled in part and on other grounds by Johnson*, 256 F.3d at 913 n.4. Because Moses had no internal enclosures dividing his land, the officer was neither inside nor outside an enclosure. So this factor is a wash.

Third, *Dunn* asks whether the homeowner appeared to use the area for private, home activities. 480 U.S. at 301–03. Circuits have split over whether to focus on how the homeowner used the area or how it looks objectively to a reasonable officer. *Compare Daughenbaugh*, 150 F.3d at 599 (objective), *and United States v. Gerard*, 362 F.3d 484, 488 (8th Cir. 2004) (same), *with Diehl*, 276 F.3d at 40–41 (actual use), *and United States v. Reilly*, 76 F.3d 1271, 1278–79 (2d Cir. 1996) (same, but also noting that an objective test would give the same result).

We hold that this factor considers only objective evidence—whether a reasonable officer would believe that the space was used for domestic activities. That is how *Dunn* framed the factor, considering only "objective data" over Justice Scalia's disagreement. 480 U.S. at 302–03 (majority), 305 (Scalia, J., concurring in part). Plus, the other *Dunn* factors look for objective evidence, so we read the third factor the same way.

13

All objective evidence was that Moses used this part of the driveway to park cars. There was no sign of domestic activity in the driveway. There is nothing domestic or private about parking cars; people park just as often on streets and in public garages. Though Moses argues that his family also used the driveway for parties, there was no sign of these gatherings to alert the officer. Thus, this factor favors the government.

Finally, consider the fourth factor: whether the family protected the area from observation. Though the property was slightly shielded by a row of low bushes in front of the yard and some patchy hedges on the property's right side, anyone walking by on the street could see clearly into the driveway. That, too, cuts against a reasonable expectation of privacy.

In sum, the third and fourth factors favor the government, the first favors Moses a little, and the second is a wash. Though we do not simply add up the factors, here they confirm our holistic conclusion that the middle of the driveway was not curtilage. Even assuming that the officer was somewhat close to the house, the driveway was open to public view and apparently used only to park cars. That is not private enough to make it an extension of Moses's home.

### C. By walking halfway up Moses's driveway, police could not learn more about Moses's home

Our conclusion that Moses's driveway was not curtilage is buttressed by reasoning from curtilage's purpose: The rationale for protecting curtilage does not extend to this patch of driveway. Officers might try to violate someone's privacy at home by walking up to the living-room window or eavesdropping at the bedroom wall. Letting police do that, the Supreme Court

has warned, "would … significantly diminish[ ]" residents' privacy *in their houses*, a space protected by the Fourth Amendment. *Jardines*, 569 U.S. at 6. Of course, police may peer into someone's house from a public street. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). But if they sneak onto the homeowner's property to learn more about its interior than they could by observing it from a public place, then they have breached an area that protects the home's privacy—the curtilage.

On that view, the officer did not intrude upon Moses's curtilage. An officer would not expect to see much more through the front windows when standing forty feet away from the house than he could when standing on the street. Nor would he think that by getting this close, he could better hear or smell what was going on inside. That tells us that the driveway is not the kind of area that the Fourth Amendment protects.

\* \* \* \* \*

Whether we take a holistic view of curtilage, check off the *Dunn* factors, or reason from curtilage's purpose, the result is the same: The officer did not invade Moses's curtilage and so did not need a warrant or applicable exception to the warrant requirement.

### IV. SECTION 922(g)(1) IS CONSTITUTIONAL AS APPLIED HERE

Finally, Moses argues that even if the gun is admissible, we must vacate his conviction because § 922(g)(1) is unconstitutional both on its face and as applied to him. But Moses was on parole when he was caught with the gun, and we have already held that the law may disarm paroled felons. *United States v.*

15

*Quailes*, 126 F.4th 215, 221, 224 (3d Cir. 2025). That fact dooms his facial challenge too. Because the law is valid as to Moses himself, it is constitutional in at least some cases. *United States v. Moore*, 111 F.4th 266, 273 n.5 (3d Cir. 2024).

\* \* \* \* \*

As part of a traffic stop, an officer followed Moses's car into his driveway, searched the car, and found a gun. Each step was constitutional: The officer could walk halfway up Moses's driveway because that did not take him within the curtilage. And as a felon on parole, Moses could be prosecuted for having the gun. We will thus affirm.

16

AMBRO, *Circuit Judge*, concurring in part and dissenting in part

Ronell Moses pulled into the driveway of his home. While he was turning, Dustin Hess, a police officer who had been tailing him for less than half a minute, turned on his lights to begin a traffic stop. Within seconds, Moses came to a complete stop about 40 feet into his driveway, past the stairs to his front porch. Hess then walked up the driveway and approached Moses. After confirming that Moses had been smoking marijuana and reviewing his medical-marijuana card, Hess asked to search Moses's car. Moses declined, but Hess searched it anyway and found a gun in the center console.

The majority believes that Hess's warrantless search was lawful because Moses was outside the curtilage of his home. In its view, curtilage covers only the most obvious extensions of the home—nooks abutting the house, side gardens, front porches, and so on.

But that is not the law. Curtilage includes any part of one's property that is physically and psychologically linked to the home. The area where Hess searched Moses's car was so linked: more than halfway up his driveway, past the stairs to his front porch, enclosed on three sides, and a site of domestic life for the Moses family. This means Hess's warrantless search was unlawful unless either an exception to the warrant requirement applied or a reasonable officer would have believed the search to be lawful. Neither argument works. I would reverse the District Court's order denying Moses's motion to suppress

1

and remand so he could withdraw his guilty plea, and thus respectfully dissent.[1]

## I. BACKGROUND

### A. Hess Searched Moses's Car in His Driveway Without a Warrant.

While on patrol, Officer Dustin Hess saw a black Chevy Impala pass his marked police car. He claims to have smelled marijuana as it passed, so he made a U-turn to investigate. He did not activate his lights or sirens. He followed the Impala for about 20 seconds before it activated its left turn signal at the end of a residential driveway. After the Impala signaled its turn, Hess turned on his emergency lights. Within five seconds, the Impala completed its turn and came to a stop 39′ 7″ into the driveway.[2] Before he got out of his patrol car, Hess confirmed

---

[1] Moses also moved to dismiss the indictment on the ground that 18 U.S.C. § 922(g)(1) violates the Second Amendment both facially and as applied to him. I agree with the majority that those challenges fail. *See United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (section 922(g)(1) is constitutional as applied to felons on supervised release); *United States v. Moore*, 111 F.4th 266, 273 n.5 (3d Cir. 2024) ("Since we reject Moore's as-applied challenge to § 922(g)(1), his facial challenge also fails ….").

[2] The District Court found that Moses had parked about 20 feet into the driveway. The majority uses this measurement in its analysis. *See* Maj. Op. 9–10. But that finding is clearly erroneous because it is mathematically inconsistent with the District Court's other findings that "the retaining wall along the left side of the driveway … begins 25 feet and 7 inches into the

2

that the car belonged to Ronell Moses and that Moses lived at that house.

Hess parked his vehicle at the end of the driveway, walked onto Moses's property, approached his Impala, and asked Moses, who was in the driver's seat, for his license. He complied and also provided a valid medical-marijuana card. Hess claims to have seen a burning marijuana cigarette in the center console cup, so he asked if Moses had any more marijuana in his car. Moses replied that he did and handed over a plastic bag filled with it.

Hess then asked, "You live here[,] right?" Moses responded, "Yeah[,] this is my house." App. 317 (video at 2:00–2:05). Hess ordered Moses out of his car and Moses again complied. Hess patted him down, finding no weapons or contraband. He then asked Moses for permission to search his car. This time, Moses declined. Hess responded, "Well here's the deal, I'm going to because I have the right to because there's marijuana inside the vehicle. So now I have the right to search it." App. 317 (video at 3:32–3:40). At the suppression hearing, Hess confirmed that he used his "power to override [Moses's] denial of consent." App. 205. While searching Moses's car, Hess unlatched the center console and found a gun inside.

Moses was later indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

driveway and continues another 18 feet and 2 inches to the beginning of the stairs," and that "[t]he Impala was parked slightly past the beginning of the stairs to the front porch of the home." App. 26. If the retaining wall began 25 feet into the driveway, and the car was parked about 18 feet past the beginning of the retaining wall, then the car was not parked "twenty feet into [the] driveway." Maj. Op. 9–10.

3

He moved to suppress all physical evidence from Hess's search. In Moses's view, his car was within the curtilage of his home, thus entitling it to Fourth Amendment protection, and so Hess's warrantless search was unlawful. The District Court denied the suppression motion, holding that the driveway was not within the curtilage of Moses's home. It then determined that Hess had probable cause to search Moses's car because he had smelled marijuana. Moses pled guilty, reserving the right to appeal the District Court's suppression decision, and was sentenced to 40 months' imprisonment followed by a three-year term of supervised release. App. 2–7.

## B.   The Moses Family Tried to Keep Their Driveway Private.

At the time of Hess's warrantless search, Moses lived with his mother, father, and two sisters. Their house is located on a residential street in the Penn Hills neighborhood of Pittsburgh. Moses's mother, Michelle Green-Moses, described their street as a "private" one in a "secluded area." App. 233–34. During the suppression hearing, she explained that she liked that "[p]eople can't walk up and down [her] space" and that her "home feels private." App. 234.

The 70′3″ long driveway is surrounded on three sides. On the right are hedges measuring 6′2″ tall. On the left is a cement retaining wall. It is around 24 inches high, begins 25′7″ into the driveway, and continues for 18′2″ to the end of the stairs leading to the front door. At the back of the driveway is a garage.

4

Bushes line the front of the property and separate the yard from the street. No other home on the same side of the street has bushes lining its front yard. The Moses family pays around $1,200 a year to maintain the landscaping, including the hedges. Ms. Green-Moses testified that she "keep[s] [her] hedges cut to the level so that things are not seen in [the property]." App. 253. Moses provided the following photograph of his driveway and front yard during the suppression hearing:



App. 49

Ms. Green-Moses also testified during the suppression hearing that her extended family gathers at her home to socialize at least twice a month. On the day of the warrantless search, family members were gathering at the property to celebrate Ms. Green-Moses's birthday; Hess himself interacted with several arriving partygoers after he conducted his search. Because Moses's father uses a wheelchair, Ms. Green-Moses testified

5

that the family usually celebrates outside in "the front of the house." App. 230. She explained that the driveway was a "meeting place for [the kids] to converse, to do whatever they want, … to enjoy family," and that her children play in the driveway and have Easter egg hunts there. App. 231.

## II. MOSES PARKED WITHIN THE CURTILAGE OF HIS HOME.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Because it "indicates with some precision the places and things encompassed by its protections," *Oliver v. United States*, 466 U.S. 170, 176 (1984), it "does not … prevent all investigations conducted on private property," *Florida v. Jardines*, 569 U.S. 1, 6 (2013). For instance, law-enforcement officers may conduct warrantless searches in so-called "open fields"—even if those areas are privately owned—because they are not enumerated in the Amendment's text. *Hester v. United States*, 265 U.S. 57, 58 (1924). "But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

"To give full practical effect to that right," we "consider[] curtilage—'the area immediately surrounding and associated with the home'—to be 'part of the home itself for Fourth Amendment purposes.'" *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *Jardines*, 569 U.S. at 6). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both

6

physically and psychologically, where privacy expectations are most heightened." *Id.* at 592–93 (quoting *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986)). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. Such conduct thus is presumptively unreasonable absent a warrant." *Id.* at 593 (citing *Jardines*, 569 U.S. at 11).

The Supreme Court has explained that curtilage questions ordinarily "should be resolved with particular reference to four factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987) (numbering added). But these four factors are only guideposts. Combining them does not "produce[] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* "Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* Reflecting their role as guides rather than catechism, as well as the limited relevance of certain factors in modern residential settings, the *Dunn* factors have gone unmentioned in the Supreme Court's two most recent curtilage cases, *Collins* and *Jardines*.

The majority holds that Hess did not cross into the home's curtilage when he searched Moses's car. In my colleagues' view, "[t]hree lines of reasoning each point to that conclusion." Maj. Op. 8. First, daily experience suggests that the

7

portion of the driveway where Moses had parked was not an extension of his home. Second, the *Dunn* factors weigh against Moses. And third, a reasonable officer would not expect to gain more information from inside Moses's house by standing on that portion of the driveway than he would by standing on the street. Each is wrong in my view. The majority misapplies the first two lines of reasoning and distorts the inquiry by giving significant weight to the third.[3]

**A.      Daily Experience Suggests That a Portion of Driveway 40 Feet from the Street, Adjoining Stairs to the Front Porch, and Enclosed on Three Sides, Is an Extension of the Home.**

The ultimate Fourth Amendment question animating the curtilage analysis is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. "[F]or most homes," "the conception defining the curtilage … is a familiar one easily understood from our daily experience." *Id.* at 302 (internal quotation marks omitted). The Supreme Court has concluded in its two most recent curtilage cases that the areas in question—a front porch and a nook at the back of a driveway—were so obviously connected to the home itself that analyzing the *Dunn* factors was

---

[3]  I agree with the majority that the logic of *Ornelas v. United States*, 517 U.S. 690 (1996), abrogates the part of our decision in *United States v. Benish*, 5 F.3d 20 (3d Cir. 1993), holding that we review ultimate curtilage determinations for clear error. Because curtilage conceptually is a mixed question of law and fact under the Fourth Amendment, we review the District Court's underlying factual findings for clear error but its ultimate legal conclusion de novo.

unnecessary. *See Collins*, 584 U.S. at 593–94; *see also Jardines*, 569 U.S. at 6–7. The majority here purports to follow the Supreme Court's lead in *Collins* and *Jardines* by sidestepping *Dunn* and instead asking directly whether daily experience suggests that the area where Moses had parked was within the curtilage of his home. It answers no.

The majority starts its "daily experience" inquiry by noting that the area "did not butt up against Moses's house," that Moses's car was parked about "twenty feet into a seventy-foot driveway," and that the driveway was not secluded.[4] Maj. Op. 9–10. But this is merely an abridged analysis of the *Dunn* factors, just without any of the analytical structure or engagement with case law. The majority has taken its intuitions about certain *Dunn* factors—several of which it acknowledges are closely divided, *see id.* at 11–12—and dubbed them daily experience. But that is not what the Court meant when it said that the "conception defining the curtilage … is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n.12. It meant there are certain paradigm cases—"like the front porch, side garden, or area 'outside the front window'"— that everyone recognizes as "area[s] adjacent to the home and 'to which the activity of home life extends.'" *Collins*, 584 U.S. at 593–94 (quoting *Jardines*, 569 U.S. at 6–7).

My colleagues purport to reinforce their conclusion by comparing the area where Moses was searched to the area found to be curtilage in *Collins*. In that case, the Supreme Court held that a motorcycle parked 30 feet up the defendant's

---

4   As I explained above, the District Court's own calculations confirm that Moses was parked about 40 feet into his driveway. *See supra* at 2 n.2. This corresponds to the measurements taken by Moses's counsel. *See* App. 50.

9

driveway in a three-sided enclosure visible from the street was within the curtilage of the defendant's home. *Id.* Contrasting Moses's property to the one in *Collins*, the majority notes that the motorcycle in *Collins* was "all the way up the driveway" in a "semi-enclosed inlet." Maj. Op. 10. The officer was also "within arm's reach" of the side of the house, and to get there, he had to walk past the line of the house's front wall. *Id.* at 10. The area where Moses was searched, on the other hand, was only mostly up the driveway and an arm's length from the stairs to the porch rather than from the house itself. According to the majority, that means Moses and his family would not reasonably regard a stranger skulking about there as having stepped into an area that was part of their home.

I disagree. *Collins* is far closer to this case than the majority lets on. For instance, "the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house." *Collins*, 584 U.S. at 593. The portion of the driveway where Moses had parked "is enclosed on two sides" by a retaining wall and a tall hedge, and "on a third side by the house." *Id*. "A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway" and, almost exactly where Hess conducted his search, turn left "up a set of steps leading to the front porch." *Id.* And this area was well over halfway up the driveway—farther than the "30 feet or so up the driveway" the officer needed to walk to reach the motorcycle in *Collins*. *Id.* at 610 (Alito, J., dissenting).

To be sure, the majority accurately identifies differences between the driveways here and in *Collins*. But *Collins* was "an easy case." *Id.* at 594. The Court did not purport to identify the outer limit of the Fourth Amendment. Indeed, it expressly contemplated that other cases presenting harder facts could still involve curtilage. Those cases are plentiful. *See, e.g.*, *United*

10

*States v. Alexander*, 888 F.3d 628, 634 (2d Cir. 2018) (driveway "open to observation from passing pedestrians, even ones with no legitimate occasion to enter it," was within curtilage of the defendant's home); *United States v. Wells*, 648 F.3d 671, 678 (8th Cir. 2011) ("[A] homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas."); *United States v. Reilly*, 76 F.3d 1271, 1277 (2d Cir. 1996) ("[A] pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door."); *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993) ("Sixty feet, in our view, is close enough to permit a finding of curtilage if other factors support such a finding."), overruled on other grounds by *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc).

To repeat, the relevant portion of Moses's property was more than halfway up the driveway, enclosed on three sides, and adjoined by a short set of stairs to the front porch leading to the house's main entrance. If anything, daily experience tells us the opposite of what the majority claims—that this area would be "intimately linked to the home, both physically and psychologically." *Jardines*, 569 U.S. at 7 (internal quotation marks omitted). After all, "[i]t is 'easily understood from our daily experience' that an arm's-length from one's house"—or, as here, the steps to one's front porch—"is a 'classic exemplar of an area adjacent to the home and to which the activity of home life extends.'" *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 561 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 7).

I would not assert so casually, as the majority does, that a reasonable person would tolerate a stranger lurking about the back of my driveway, mere feet away from the steps to my front door. At a minimum, I would raise an eyebrow. More

11

likely, I would think they had ventured into my private space and intruded on my privacy. The driveway here is thus much more like the one in *Collins*—the easy case—than the barn in *Dunn*, which was half a football field away from the main house. *Dunn*, 480 U.S. at 297.

## B.  The *Dunn* Factors Favor Moses.

Another way courts distinguish between curtilage and open fields is by considering the factors laid out in *Dunn*. These include (1) "the **proximity** of the area claimed to be curtilage to the home"; (2) "whether the area is included within an **enclosure** surrounding the home"; (3) "the nature of the **uses** to which the area is put"; and (4) "the **steps taken** by the resident to protect the area from observation by people passing." *Dunn*, 480 U.S. at 301 (emphases added). This is not a bean-counting exercise. As the majority recognizes, the *Dunn* factors are guideposts in our quest to answer the ultimate Fourth Amendment question: "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* But guideposts are helpful only if used properly. Here, the majority not only misapplies all four factors but also rests its analysis on what I believe are factual inaccuracies.

### 1.  The area where Moses parked his car was more than halfway up the driveway and abutted the stairs to the front porch.

The majority holds that the first *Dunn* factor—proximity to the home—weighs only slightly in Moses's favor because Hess "did not get close to [the] house" and "was likely slightly closer to the street than to Moses's house and certainly thirty to forty feet away from the house." Maj. Op. 12. My colleagues not only understand this factor too narrowly—they also

misconstrue the record. In my view, this factor decisively favors Moses.

First, a portion of property need not physically abut the house to fall within the home's curtilage. Indeed, "[a]t common law the curtilage was far more expansive than the front porch, sometimes said to reach as far as an English longbow shot—some 200 yards—from the dwelling house." *United States v. Carloss*, 818 F.3d 988, 1005 n.1 (10th Cir. 2016) (Gorsuch, J., dissenting). Although physically abutting the house is a strong indication that the portion of property is within the curtilage, "[t]here is not … any fixed distance at which curtilage ends." *Depew*, 8 F.3d at 1427.

The point of this factor is to gauge whether the area is close enough to the house, given the totality of circumstances, that the two are "physically and psychologically" linked. *Collins*, 584 U.S. at 593 (citation and quotation marks omitted). Here, the area of the driveway was close enough to forge that link. Moses parked his car closer to the house and his front porch—clear-cut curtilage under *Jardines*—than the majority claims. When Moses came to a stop, he was 39′ 7″ into the 70′ 3″ driveway—not, as my colleagues claim, "closer to the street than to [the] house." Maj. Op. 12. And he parked past the retaining wall that began 25′ 7″ into the driveway, as well as "slightly past the beginning of the stairs to the front porch of the home." App. 26. Mere steps from the front porch leading to the front door is comfortably within the area "immediately surrounding and associated with the home"—the very definition of curtilage. *Jardines*, 569 U.S. at 6 (quoting *Oliver,* 466 U.S. at 180).

### 2. The area was enclosed on three sides by a retaining wall, the garage, and a hedgerow.

The second *Dunn* factor asks whether the area is within an enclosure surrounding the home. "[T]his factor seeks to account for the divisions that a property owner herself has created with her property, and is premised on the notion that 'for most homes, the boundaries of the curtilage will be clearly marked.'" *Alexander*, 888 F.3d at 633 (quoting *Dunn*, 480 U.S. at 302).

My colleagues conclude that this factor is neutral because Moses had no fences, walls, or other enclosures separating the area where he had parked from the rest of the property. They acknowledge that Moses had a tall hedgerow to the right of the driveway, but they discount this boundary because it falls on the property line, and thus supposedly cannot create an internal enclosure.

To begin, there is no reason a fence or hedge cannot both demarcate the edge of the property and create an internal enclosure within that property. If a property owner enclosed his small backyard with a fence connected to his house, we would have no trouble recognizing that he had also tried to create an internal enclosure connecting his yard to the home. We would not conclude otherwise just because that backyard bordered a neighboring plot.

The hedge here is no different. It forms an internal enclosure connected to the house together with two other boundaries that go unmentioned by the majority: the garage to the front and the retaining wall to the left. The driveway was thus partly enclosed "on three sides, … marking off the home and modest yard and driveway areas from adjoining properties," *as well as* from the bulk of Moses's own property. *Alexander*, 888 F.3d at 633. If the majority believes something more than a

14

retaining wall or the edifice of the house is needed to form an enclosure, then it is mistaken. This case comes to us from the suburbs of Pittsburgh, not Early Modern England—"[i]t is unlikely that a property as small as [Moses's] would be subdivided like the property in *Dunn*." *Id.*

### 3. The actual use of the disputed area was domestic and recreational.

The third *Dunn* factor asks about the nature of the area's usage. The majority holds that this factor looks only at "objective evidence"—that is, evidence that bears on "whether a reasonable officer would believe that the space was used for domestic activities." Maj. Op. 13. In its view, "[t]here was no sign of domestic activity in the driveway"—"[a]ll objective evidence was that Moses used this part of the driveway to park cars." *Id.* at 14. It thus holds that this factor weighs strongly against Moses.

The majority's objective-evidence rule misunderstands the inquiry and flouts the weight of authority since *Dunn*. The purpose of this factor, like each of the *Dunn* factors, is to help us determine whether the area is one "to which the activity of home life extends." *Jardines*, 569 U.S. at 7 (citation and quotation marks omitted). The factors are not meant, as the majority claims, to help us determine whether a reasonable person would think that it is such an area. That test "would totally eviscerate the [Fourth Amendment's] protection, making it depend on the exigencies of night or day, rain or shine, and winter or summer," and "would turn the concept upside down, presuming the absence of curtilage until and unless the contrary appears." *United States v. Diehl*, 276 F.3d 32, 40–41 (1st Cir. 2002).

15

The majority's critical analytical error is in merging the curtilage inquiry with the later good-faith inquiry, the latter of which asks whether a reasonable officer would think his or her conduct was legal. In other words, it substitutes the question required by *Dunn*—whether the activity of Moses's family and homelife extended to the driveway—with the later good-faith question—whether Officer Hess could have reasonably believed the driveway was curtilage. Asking the wrong question leads to the wrong answer.

Justice Scalia recognized this issue in *Dunn*: "[t]he officers' perceptions might be relevant to whether intrusion upon curtilage was nevertheless reasonable, but they are no more relevant to whether the barn was curtilage than to whether the house was a house." *Dunn*, 480 U.S. at 305 (Scalia, J., concurring). My colleagues ignore Justice Scalia's insight because they claim that the *Dunn* Court rejected it. But they are mistaken. The *Dunn* Court found it "especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home," but it never held that its analysis was limited to objective data. *Id.* at 302. If that were so, it would amaze courts of appeals around the country, which have largely understood *Dunn* to articulate an actual-usage test. *See, e.g.*, *United States v. Ronquillo*, 94 F.4th 1169, 1175 (10th Cir. 2024) (considering actual usage of garage); *Wells*, 648 F.3d at 677 ("And, in any event, '[o]ne is not required to keep particular domestic objects on one's lawn in order to maintain a reasonable expectation of privacy.'" (brackets in original) (citation omitted)); *United States v. Davis*, 530 F.3d 1069, 1078 (9th Cir. 2008) ("In *Dunn*, the Court analyzed the use of the barn at issue in that case from the point of view of officers approaching the area, *and in light of its actual use*." (emphasis added)); *Diehl*, 276 F.3d at 40 ("[W]e are not willing to expand [the Fourth Amendment test]

16

to require that, to invoke curtilage protection, there must be objective evidence of intimate uses possessed by officers."); *Johnson*, 256 F.3d at 903 ("We have never held that an officer lacking any prior objective knowledge of the use of an outbuilding may approach it free of Fourth Amendment constraints."); *Reilly*, 76 F.3d at 1278 ("We do not believe that [the Court's discussion of objective data in *Dunn*] alters [its] earlier statements about the importance of actual use.").

The record shows that the Moses family used the driveway for domestic and recreational purposes. They used it around twice a month to host family gatherings, including just moments after Hess searched the area. Ms. Green-Moses testified that the driveway was a "meeting place for [the kids] to converse, to do whatever they want, [and] to enjoy family." App. 231. And she explained that children play in the driveway and have Easter egg hunts there.

The majority (and the District Court) accurately note that "Moses used this part of the driveway to park cars." Maj. Op. 14. But that does not matter for curtilage purposes if the activity of the homelife extends to the area. Even when a "driveway's 'primary use' [is] for parking cars," this factor still suggests that the space is curtilage if it "[is] used 'at least occasionally for recreation' such as hosting barbeques," and is continuous with an area of the home that was within the curtilage, like the front porch. *Alexander*, 888 F.3d at 633 (citation omitted). Given the undisputed record evidence that the Moses family regularly used the driveway for family gatherings, this factor also supports Moses.

17

### 4. Moses's family took significant steps to reduce the visibility of the area from the public street.

The final *Dunn* factor asks what steps the property owner took to protect the area from observation. Despite what the majority claims, this factor does not ask merely whether the space can be observed.

My colleagues acknowledge that the property was "slightly shielded," but they claim that "anyone walking by on the street could see clearly into the driveway," which "cuts against a reasonable expectation of privacy." Maj. Op. 14. But this argument again misunderstands the inquiry, which focuses on the occupant's *efforts* to reduce public observation. Visibility from the street does not have decisive weight in the curtilage analysis. "[A] homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas." *Wells*, 648 F.3d at 678. The record shows "steps taken" by the Moses family "to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. Ms. Green-Moses testified that the family spent around $1,200 per year on landscaping. They did so in part to ensure that the front and side hedges continued to afford them privacy. She explained that the landscaping was a financial burden and that she had discussed cutting down the hedges with her husband several times but ultimately decided against it: "the discussion that [they] always come back to [is that] this is [their] sense of privacy." App. 238. They "ke[pt] [their] hedges cut to the level so things are not seen in it." App. 253.

We have also explained that "the configuration of the streets and houses in many parts of the city may make it impossible, or at least highly impracticable[,] to screen one's home and yard from view." *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992) (citation and quotation marks

18

omitted). *Acosta* concerned an apartment complex, where it was unrealistic for its residents to erect barriers in common spaces. By contrast, the occupant of a single-family suburban house has more flexibility (though less than the owner of a sprawling rural property like in *Dunn*). But there is a spectrum of efforts a suburban property owner might take to protect his or her home from curious neighbors. Those efforts range from doing nothing to erecting high walls. The Moses family did something in between—spending money on landscaping to provide some, but not total, protection from public view. At a minimum, the record shows "steps taken" by the Moses family "to protect the area from observation." *Dunn*, 480 U.S. at 301. They did not erect six-foot-tall fences around the entire property, yet they could still "reasonably expect[] that members of the public would not traipse" halfway up the driveway, past the front porch, to "freely observe." *Wells*, 648 F.3d at 678. After all, "it is not necessary to turn a residential property into a fortress in order to prevent the police from 'trawl[ing]' one's yard, unencumbered by the Constitution." *Alexander*, 888 F.3d at 635 (quoting *Jardines*, 569 U.S. at 6).

## C. The Majority's Sensory-Advantage Rationale Is Flawed, Both Theoretically and as Applied to Moses's Property.

The majority's final argument is that Moses's driveway is not curtilage given the doctrine's purpose. In my colleagues' view, curtilage protects residents' "privacy *in their houses*." Maj. Op. 15 (emphasis in original). The portion of the driveway where Hess searched Moses's car was, in their view, too far from the house to afford Hess any sensory insight into the Moses family's goings-on that he would not have similarly enjoyed from the public street. This argument is wrong for two reasons.

19

First, the majority boldly asserts that an officer standing where Hess searched Moses "would not expect to see much more through the front window" or to "hear or smell better what was going on inside" the house. *Id.* Frankly, it defies common sense to claim that a police officer 40 feet up a driveway, within a stone's throw of the house and an arm's length from the porch, would not gain greater insight into the house than he would from the public street. The majority characterizes Officer Hess as having covered this ground with just "a few paces from the public street." *Id.* at 12. Even the District Court's erroneous calculation of 20 feet from the road, however, was not "a few paces." The majority cannot change reality with a folksy turn of phrase. If Officer Hess could smell marijuana while passing a car going in the opposite direction on an open road, it seems at least as likely that he could smell marijuana emanating from a house only 10 yards away.

But more fundamentally, the majority simply misunderstands curtilage. My colleagues treat it as an area separate from the home that enjoys Fourth Amendment protection only to insulate the house from invasions of privacy. If an officer's trespass onto a person's property affords him no advantage in perceiving into the *house*, then on the majority's view the officer is outside the curtilage.

I, by contrast, hew to the definition given by the Supreme Court. It has repeatedly said that "[t]o give full practical effect to" the Fourth Amendment's protection of the home, we "consider[] curtilage—'the area immediately surrounding and associated with the home'—to be '*part of the home itself for Fourth Amendment purposes*.'" *Collins*, 584 U.S. at 592 (quoting *Jardines*, 569 U.S. at 6) (emphasis added) (internal quotations omitted).

20

The majority's sensory-advantage framework also warps the *Dunn* factors. If curtilage turns on whether the officer gains insight into the house, then the proximity factor will often get decisive weight. After all, how could a police officer gain a meaningful sensory advantage into a house when standing 75 feet away? But proximity does *not* get decisive weight. Proximity-based rules like the one the majority effectively announces "cannot be reconciled with the Supreme Court's warning in *Dunn* against mechanistic application of any one factor." *Reilly*, 76 F.3d at 1277 (citing *Dunn*, 480 U.S. at 301). Courts of appeals consistently hold that parcels of property much farther removed from the house than the driveway here fall within the curtilage of the home. For example, in *Diehl* the First Circuit held that a driveway 82 feet from a campsite was within the curtilage. 276 F.3d at 39. And in *Reilly* the Second Circuit held that a cottage 375 feet from the main house was also within the curtilage. 76 F.3d at 1275, 1279.

The majority's rationale also makes a mess of the visibility factor. If the house or an area surrounding it is easily visible from a public street and the property owner makes no effort to shield it, then under *Dunn* we would weigh that fact against curtilage. Curiously, the majority seems to suggest that this could sometimes *favor* curtilage. The officer at the unobstructed house may have an easier time getting a better view if he gets closer. And inversely, the officer at the well-shielded house might not get much of a sensory advantage even if he gets closer.

\*       \*       \*

The majority believes that Hess searched Moses outside the curtilage of his home. It tried to support its conclusion with three arguments. But none works. Everyday experience tells us that an area more than halfway up a driveway, enclosed on

21

three sides, and mere feet from the steps to one's front porch, is intimately connected to the home. The *Dunn* factors all support that conclusion. And the majority's claim that an officer would gain no additional insight into the house than he would get from the public street is doubly wrong. Here, an officer would. And even so, sensory advantage is not the test, and the majority hardly attempts to defend its novel assertion that it is.

## III. NONE OF THE EXCEPTIONS TO THE WARRANT REQUIREMENT APPLIES.

If Moses is right that Hess searched him within the curtilage of his home, then that means the warrantless search was presumptively unreasonable. "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

The Government here argues that Hess's search was authorized by two exceptions to the warrant requirement. First, in its view, Moses "gave his implied consent for Officer Hess" to search his vehicle within the curtilage of his home by pulling into the driveway rather than pulling over on the side of the road. Appellee's Br. 38. Second, the Government claims that Hess was in hot pursuit of Moses because the pullover began on a public street. Neither argument is persuasive.

## A. Moses Did Not Consent to Hess's Search Within the Curtilage of His Home.

The Government first argues that Moses impliedly consented to the search of his home by pulling into the driveway rather than stopping on the street. Moses correctly responds that the Government mischaracterizes the record. According to the dashcam footage and Hess's own testimony, Hess followed

22

Moses for only 20 seconds before Moses activated his left turn signal. Moses signaled that he was turning into his driveway *before* Hess turned on his lights. At the suppression hearing, Hess testified that he activated his lights to pull Moses over only after he saw that Moses started pulling into his driveway.

Even if Moses had consented to Hess's entering the curtilage of his home, he did not consent to a search. The Government's argument—that we may infer implied consent to conduct a warrantless search of Moses's home generally from his split-second decision to turn—goes too far. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness …." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). I doubt that a reasonable observer would conclude that Moses's turn into his driveway was a sweeping invitation for the police to search his home.

The Government's argument fails, however, for a more straightforward reason: Moses revoked any consent when he explicitly declined Hess's request to search the car. At the suppression hearing, Hess confirmed that he had used his "power to override [Moses's] denial of consent." App. 205. Even if there were consent, "the subject of a consensual search may terminate the search by withdrawing his consent." *United States v. Williams*, 898 F.3d 323, 330 (3d Cir. 2018). That is because "the subject of a consensual search," like Moses, "determines the parameters of that search." *Id.* Just so here.

## B. Hess Was Not in Hot Pursuit of Moses.

The Government also argues that Hess's warrantless search was justified by the hot-pursuit doctrine. This, however, was no hot pursuit. Although the Government is correct that hot pursuit need not be "reminiscent of the opening scene of a James Bond film," Appellee's Br. 42 (quoting *Lange v.*

23

*California*, 594 U.S. 295, 329 (2021) (Roberts, C.J., concurring)), it must involve a *pursuit* of some kind, *see United States v. Santana*, 427 U.S. 38, 42–43 (1976) ("'[H]ot pursuit' means some sort of a chase."). The Government's argument that this case involved a chase contradicts Hess's own testimony. Hess confirmed that he had "no concern that Mr. Moses in any was trying to flee or avoid [his] … show of authority," and that Moses had not "prolonged the period" between Hess's activating his emergency lights and pulling him over. App. 185. Without a chase there can be no hot pursuit.

Finally, the Government invokes the Supreme Court's decision in *Scher v. United States*, 305 U.S. 251 (1938). The Court in that case provided little explanation for its conclusion that the search of the defendant had been lawful, but noted that "[e]xamination of the automobile accompanied an arrest, without objection and upon admission of probable guilt." *Id.* at 255. In *Collins*, the Court declined to consider *Scher* in its own curtilage analysis. It concluded that "*Scher*'s reasoning … was both case specific and imprecise, sounding in multiple doctrines, particularly, and perhaps most appropriately, hot pursuit." 584 U.S. at 599. But because it fits so poorly in our present Fourth Amendment doctrine, the Court explained that *Scher* "is best regarded as a factbound [decision]." *Id.* Our case is easily distinguished. Hess's search was not "without objection and upon admission of probable guilt," *Scher*, 305 U.S. at 255, so *Collins* tells us to set *Scher* aside, 584 U.S. at 599.

## IV.   THE GOOD-FAITH EXCEPTION DOES NOT APPLY.

As explained, Hess's warrantless search violated Moses's Fourth Amendment rights. But that is a separate question from whether the evidence seized from that search should be

suppressed. "[T]here is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc). The exclusionary rule is instead a prophylactic measure—"a judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone v. Powell*, 428 U.S. 465, 482 (1976). The good-faith exception to the exclusionary rule "was developed to effect[] this balance," *Katzin*, 769 F.3d at 171, and applies when a law-enforcement officer acts "upon an objectively reasonable good faith belief in the legality of [his] conduct," *United States v. Vasquez-Algarin*, 821 F.3d 467, 483 (3d Cir. 2016) (quotation omitted).

The Government claims that "it was objectively reasonable for Officer Hess to have a good faith belief in the lawfulness of his conduct." Appellee's Br. 44. And even if "Moses stopped within the curtilage of the house, it was objectively reasonable for Officer Hess to approach Moses's car and treat it equally as if stopped on a public road." *Id.* at 45.

I disagree. First, the Government's curtilage argument would extend the good-faith exception to every search within the curtilage of a home except the most obviously illegal. But urban and suburban homes rarely designate areas as "obviously marked off as within the curtilage." *Id.* at 44. That is why the Supreme Court has articulated a multifactor test and warned us not to apply it mechanically.

*Collins* and *Jardines* are close enough to this case that a reasonable officer would know that this portion of the driveway was within the curtilage of Moses's home. *Collins*, which the Supreme Court decided two years before Hess's search, explained that a "driveway enclosure … constitutes an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage." 584 U.S. at 593–94

25

(quotation marks omitted). *Jardines* likewise held that any area "immediately surrounding and associated with the home" qualifies as curtilage and is entitled to Fourth Amendment protection. 569 U.S. at 6 (quoting *Oliver*, 466 U.S. at 180). And on top of the ready analogues in *Collins* and *Jardines*, the *Dunn* factors also point decisively toward a curtilage determination. *See Dunn*, 480 U.S. at 301. It is not credible, to my mind, that a reasonable police officer could think that an area 40 feet into a driveway, surrounded on three sides, and past a short set of stairs leading to the porch, is not "immediately surrounding" the home. "Under *Jardines*, there exist no 'semiprivate areas' within the curtilage where governmental agents may roam from edge to edge.'" *Bovat v. Vermont*, 141 S.Ct. 22, 24 (2020) (mem.) (Gorsuch, J., statement respecting the denial of certiorari).

I also disagree with the Government's contention that "it was objectively reasonable for Officer Hess to approach Moses's car and treat it equally as if stopped on a public road." Appellee's Br. 45. That would be true only if an objectively reasonable officer under the circumstances would have believed that (1) the automobile exception applies within curtilage, (2) Moses consented to the search, or (3) the hot-pursuit exception applied.

*Collins* expressly rejects the first possibility. 584 U.S. at 598 ("[W]e decline [the] invitation to extend the automobile exception to permit a warrantless intrusion on a home or its curtilage."). The second possibility also fails. Even if it were reasonable to believe that Moses had impliedly consented to a search of his home, it would have been unreasonable to believe that consent continued after Moses expressly revoked it.

That leaves the hot-pursuit exception. I believe, however, that an objectively reasonable officer would have

26

concluded—as Hess did—that Moses, who came to a complete stop within an enclosed driveway five seconds after Hess turned on his lights, was not trying to flee. And if a reasonable officer would not have thought that Moses was fleeing, then he could not have thought that the hot-pursuit exception applied.

## V.     CONCLUSION

The majority tries a belt-and-suspenders approach to justify Hess's warrantless search. I instead would hold simply that Moses's driveway is like the driveway in *Collins*—an easy case, according to the Court—in all the relevant ways. The *Dunn* factors, properly applied, fortify that conclusion. The majority disagrees, so I respectfully dissent.